# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURORA LOPEZ, | Case No. 1:19-cv-01311-SAB |
| Plaintiff, | ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 19, 20, 21) |
| Defendant. | |

## I.

## INTRODUCTION

Aurora Lopez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

For the reasons set forth below, Plaintiff's Social Security appeal shall be granted.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title XVI application for supplemental security income on April 6, 2015. (AR 91.) Plaintiff's application was initially denied on August 27, 2015, and

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge and the matter has been assigned to the undersigned for all purposes. (See ECF Nos. 8, 10, 22.)

1    denied upon reconsideration on January 13, 2016.  (AR 109-113, 119-123.)  Plaintiff requested

2    and received a hearing before Administrative Law Judge Joyce Frost-Wolf ("the ALJ").  Plaintiff

3    appeared for a hearing on March 14, 2018.  (AR 44-73.)  On June 26, 2018, the ALJ found that

4    Plaintiff was not disabled.  (AR 21-37.)  The Appeals Council denied Plaintiff's request for

5    review on June 6, 2019.  (AR 7-9.)

6        Plaintiff filed an opening brief on July 27, 2020.  (ECF No. 19.)  Defendant filed an

7    opposition to the opening brief on August 26, 2020; and Plaintiff filed a reply on September 9,

8    2020.  (ECF No. 21.)

9    **A.      Hearing Testimony**

10        Plaintiff appeared with counsel and testified at the March 14, 2018 hearing.  (AR 47-49,

11   52-68.)  Plaintiff was born on May 24, 1972.  (AR 52.)  She is 5 foot 2 inches tall and weighs

12   242 pounds.  (AR 66.)  She has lost thirty five pounds since having a heart attack.  (AR 66.)  She

13   lives in a single story house with her two children, ages 17 and 10, and a German Shepherd.  (AR

14   53.)  Plaintiff attended high school thorough the eleventh grade.  (AR 53.)  Plaintiff has a

15   driver's license, but does not drive unless she has to.  (AR 67.)  She only drives locally for short

16   distances.  (AR 68.)

17        Plaintiff worked in food prep full-time for a hospital in 2009 and 2010.  (AR 54.)  She

18   would do basic food prep and was a part-time activities assistant.  (AR 54-55.)  When she was

19   not in the kitchen prepping food, she would be helping clients during their feeding time, assisting

20   them in the restroom, or taking them for walks outside.  (AR 55.)  Plaintiff would lift no more

21   than 25 to 30 pounds three times per week and did not do a lot of lifting.  (AR 55.)

22        Plaintiff worked part-time for a school district in 2011.  (AR 56.)  She also worked part-

23   time as a security guard in the evenings.  (AR 56.)

24        Plaintiff's day starts at 7:30 in the morning when she drops her children off at school.

25   (AR 57.)  She picks her son up at 2:27 and her daughter at 3:15 Monday through Friday.  (AR

26   57.)  Sometimes the children will have breakfast at home, but sometimes they will eat at school

27   so she will drop them off earlier.  (AR 57.)  After she drops the children at school, Plaintiff will

28   go home and do her household chores.  (AR 58.)  Plaintiff's daughter helps out around the house.

(AR 58.)  Plaintiff will do the dishes, she can unload a complete load of dishes.  (AR 58.)  She will sit for a while because she gets tired of standing and her lower back will begin to ache.  (AR 58.)  Plaintiff has pain in her lower back if she sits for thirty minutes or longer.  (AR 59.)  She will continue with her chores so that when the kids get home she can get a small meal and get their homework done.  (AR 59.)  When her children are home she will keep herself busy working on chores that did not get finished, whether doing meal prep or helping them with homework, etc.  (AR 62.)  They will have dinner later in the evening.  (AR 59.)  Plaintiff is able to cook, but gets tired of standing after thirty minutes.  (AR 59.)  She will rest in between and sometimes her son will help out.  (AR 59.)  Plaintiff will take a nap two to three times during the week for an hour to an hour and a half.  (AR 60.)

Plaintiff takes her medication during the day and it makes her dizzy so she will sit and watch television.  (AR 60.)  Sometimes she gets sleepy.  (AR 60.)  Within an hour of taking her medication, Plaintiff will get very dizzy and will sometimes get nauseated if she takes them on an empty stomach.  (AR 60.)  Plaintiff gets short of breath if she does not take her medication.  (AR 69.)

During the winter, Plaintiff has trouble getting out of bed due to a lower slipped disc that she has after an accident many, many years ago.  (AR 58.)  She has trouble getting out of bed due to arthritis and has trouble sleeping at night due to her legs, and pain in her lower back and upper and lower extremities, especially her right knee.  (AR 58.)  Since Plaintiff got her pacemaker she constantly has chest pain which the doctor tells her is normal because her heart is fairly swollen.  (AR 60.)  Since her surgery, she has numbness and tingling in her left arm, and upper extremities.  (AR 60-61.)  Plaintiff is right handed and since her surgery feels her left arm is weaker than the right.  (AR 61.)  She will catch herself using her right hand at times.  (AR 61.)

Plaintiff has anxiety daily, especially when she is home alone.  (AR 61.)  Plaintiff takes medication for her anxiety but it does not help.  (AR 62.)  Plaintiff has spoken to her doctor about it but due to her heart condition there are limited doses of medication that she can take.  (AR 62.)  Plaintiff has a lot of panic attacks.  (AR 62.)  She stated that she felt one coming on during the hearing and had not taken her medication that morning.  (AR 62.)  The majority of her

1    panic attacks have occurred since she had her heart attack and while being home alone.  (AR 63.)
2    When she has a panic attack, Plaintiff will feel sad and confused.  (AR 63.)  She has felt suicidal
3    at times and went into rehab for that a year and a half ago.  (AR 63.)  Her doctor is in the process
4    of sending her to counseling for it.  (AR 63.)  She does not feel like doing anything and will just
5    sit there and cry.  (AR 63.)  This happens at least twice a day.  (AR 63.)

6         Plaintiff recently had an x-ray of her right knee and her primary care physician referred
7    her to an orthopedist to have the right knee drained.  (AR 63.)  She is waiting on authorization
8    from her insurance company.  (AR 63-64.)  Plaintiff started seeing her primary care doctor
9    weekly three weeks prior to the hearing.  (AR 64.)  Prior to that she was seeing the doctor
10   probably once a month.  (AR 64.)

11        Plaintiff has no difficulties in performing her personal care.  (AR 65.)  She is most
12   comfortable when she is sitting down in a recliner with her feet elevated.  (AR 65.)  She sits in
13   that position forty percent of the day while her kids are at school.  (AR 65.)  She sits in that
14   position because of the side effects of her medication and when she is not performing her
15   household chores.  (AR 65.)

16        Plaintiff had a doctor prescribe marijuana after her heart attack due to chronic back pain,
17   but she refused to take it.  (AR 65-66.)

18        Plaintiff does not have a lot of family in Fresno and hangs out with her children.  (AR
19   66.)  She attends church on a regular basis.  (AR 66.)  She is able to climb the nine to ten steps to
20   the church, but gets a little short of breath.  (AR 66-67.)  The service lasts about an hour and ten
21   minutes and Plaintiff is able to sit for about thirty-five minutes and then will stand for about
22   fifteen minutes before being seated again.  (AR 67.)

23        Cheryl Chandler, a vocational expert ("VE") also testified at the hearing.  (AR 68-72.)

24   **B.    ALJ Findings**

25   The ALJ made the following findings of fact and conclusions of law.

26        • Plaintiff has not engaged in substantial gainful activity since the application date
27             of April 6, 2015.

28        • Plaintiff has the following severe impairments: obesity, cardiomyopathy with

4

implantable cardiac defibrillator, congestive heart failure, arthritis of the right knee, depressive disorder and anxiety disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 416.967(a), except she can never climb ladders, ramps or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She can occasionally be around heavy machines with fast-moving parts, but cannot work at unprotected heights. She is limited to simple routine tasks.

- Plaintiff is unable to preform any past relevant work.

- Plaintiff was born on May 24, 1972, and was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed. Plaintiff subsequently changed age category to a younger individual age 45-49.

- Plaintiff has a limited education and is able to communicate in English.

- Transferability of job skills is not an issue in this case because Plaintiff's past relevant work is unskilled.

- Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

- Plaintiff has not been under a disability, as defined in the Social Security Act, since April 6, 2015, the date the application was filed.

(AR 26-36.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm

1   simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

2   Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

3   this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

4   for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

5   susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

6   upheld.").

7                                              IV.

8                              DISCUSSION AND ANALYSIS

9          Plaintiff contends that the ALJ erred by 1) failing to provide specific and legitimate

10  reasons to reject the opinion of consultative examiner, Dr. Michiel; 2) failing to develop the

11  record to obtain an updated assessment of Plaintiff's physical functioning; and 3) improperly

12  rejecting Plaintiff's symptom testimony.

13         Defendant counters that the ALJ's opinion is consistent with Dr. Michiel's opinion; that

14  the ALJ properly developed the record and that Plaintiff waived the argument that the record was

15  incomplete by affirming to the ALJ that the record was complete, alternately, Defendant argues

16  that the record was adequate to render a decision regarding Plaintiff's residual functional

17  capacity; and that Plaintiff ignores the ALJ's reasons for finding that her symptom testimony was

18  not credible.

19         Plaintiff replies that the ALJ failed to accommodate the moderate limitations opined by

20  Dr. Michiel and the Commissioner misstates the claimant's responsibility as outlined in the

21  regulations as to development of the record.

22         A.      Physician Opinion

23         Plaintiff argues that the ALJ failed to provide specific and legitimate reasons to reject the

24  opinion of Dr. Michiel.  Defendant counters that Dr. Michiel's opinion is consistent with the

25  ALJ's finding that Plaintiff was limited to simple routine tasks.  Plaintiff replies that the

26  moderate limitations opined by Dr. Michiel are not incorporated by limiting Plaintiff to simple,

27  routine tasks.

28         The weight to be given to medical opinions depends upon whether the opinion is

1  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

2  821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded

3  more weight than those of non-examining physicians, and the opinions of examining non-

4  treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495

5  F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)).  "If a treating or

6  examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject

7  it by providing specific and legitimate reasons that are supported by substantial evidence."

8  Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)).  The

9  contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific,

10  legitimate reason for rejecting a treating or examining physician's opinion, however, "it may

11  constitute substantial evidence when it is consistent with other independent evidence in the

12  record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The ALJ need not accept

13  the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.

14  Thomas, 278 F.3d at 957.

15        In considering how Plaintiff's mental impairments affected her ability to work, the ALJ

16  considered the September 2017 consultative examination by Dr. Michiel.  (AR 34.)  Dr. Michiel

17  performed a psychiatric evaluation of Plaintiff on September 1, 2017.  (AR 1464-1467.)  Plaintiff

18  reported anxiety, panic attacks, and depression.  (AR 1464.)  Plaintiff reported that three years

19  ago she had problems with heart failure, shortness of breath, and had a pacemaker placed.  (AR

20  1464.)  Plaintiff stated that she started having anxiety attacks and will sometimes have one while

21  shopping which causes her heart to race.  (AR 1464.)  Plaintiff endorsed insomnia, crying a lot,

22  being tired, having no motivation or interest, and feeling useless.  (AR 1464.)

23        Dr. Michiel considered that the record noted that in 2015 Plaintiff had been taking Zoloft

24  and Xanax, and she stopped the Zoloft, taking the Xanax twice per day.  (AR 1464.)  Plaintiff

25  reported that her cardiologist had taken her off the medications because of her and heart.  (AR

26  1464.)  In 2015, Plaintiff had been hospitalized for five days in the PACT unit after being very

27  depressed and talking about death.  (AR 1465.)

28        Plaintiff reported that she lives with her children and is able to cook and do household

1    chores with the help of her children.  (AR 1465.)

2        Plaintiff was fairly groomed and casually dressed with adequate personal hygiene.  (AR

3    1465.)  Her gait and posture were normal.  (AR 1465.)  There were no involuntary movements or

4    specific mannerisms noted.  (AR 1465.)  Plaintiff kept fair eye contact throughout the interview.

5    (AR 1465.)  Speech was normal in process with slight latency, and general body movements

6    were normal.  (AR 1465.)  Plaintiff's mood was "depressed" and affect was restricted.  (AR

7    1465.)  She denied any suicidal or homicidal ideations.  (AR 1465.)  Thought process was goal

8    directed, thought content was not delusional, and Plaintiff denied hallucinations or illusion.  (AR

9    1466.)

10        Plaintiff was oriented to person, place, time, and date.  (AR 1466.)  She was able to do

11    digit span five out of five forward and backwards correctly.  (AR 1466.)  She could recall three

12    out of three items immediately and two after five minutes.  (AR 1466.)  She was able to do

13    simple math calculations.  (AR 1466.)  She was able to name the current and former two

14    presidents but did not remember President Obama's first name.  (AR 1466.)  Plaintiff's memory

15    was intact.  (AR 1466.)  Plaintiff was diagnosed with adjustment disorder with depression and

16    anxiety, status post myocardial infraction and placement of a pacemaker; and a global

17    assessment of functioning ("GAF") score of 50 to 55.  (AR 1466.)

18        Dr. Michiel opined that Plaintiff was able to able to maintain attention and concentration

19    to carry out simple job instructions; can relate and interact with coworkers, supervisors and the

20    general public while in the routine setting of performing simple job instructions; and is unable to

21    maintain attention and concentration to carry out an extensive variety of technical and/or

22    complex instructions.  (AR 34, 1466-1467.)  Plaintiff had no restrictions in her activities of daily

23    living.  (AR 1467.)

24        Dr. Michiel also completed a medical source statement of ability to do work related

25    activities.  (AR 34, 1461-1462.)  Dr. Michiel found that Plaintiff had no restrictions in her ability

26    to understand and remember simple instructions, to carry out simple instructions, or to make

27    judgments on simple work-related decisions.  (AR 1461.)  Plaintiff was moderately limited in her

28    ability to understand and remember complex instructions and to carry out complex instructions

and markedly limited in her ability to make judgments on complex, work-related decisions.  (AR 1461, 34.)  Plaintiff had no limitations in her ability to interact appropriately with the public, her environment or co-workers in a simple routine setting, and was moderately limited in her ability to respond appropriately to usual work situations and to change in a routine work setting.  (AR 34, 1462.)

The ALJ gave great weight to Dr. Michiel's opinion that Plaintiff was able to perform simple job instructions for the same reason discussed regarding the opinions of Drs. Lewis and Brooks.  (AR 34-35.)  The ALJ gave little weight to Dr. Brooks' opinion that Plaintiff did not have a severe mental impairment and to Dr. Lewis' opinion that Plaintiff was not significantly limited in any area of mental functioning and that the likelihood of her emotionally deteriorating in a work environment minimal finding them not wholly consistent with the evidence of record.  (AR 34.)  Specifically, the ALJ found that Plaintiff had sought treatment for her mental symptoms, particularly her anxiety related symptoms.  (AR 34.)  However, the ALJ also found that she generally exhibited unremarkable mental status examinations.  (AR 34.)  So as to not exacerbate Plaintiff's anxiety related symptoms, the ALJ found that Plaintiff was limited to simple routine tasks, but based on her generally normal mental status examinations, the ALJ found that Plaintiff can perform these tasks on a regular and continuing basis.  (AR 34.)  For these reasons, the ALJ gave little weight to Dr. Michiel's opinion regarding Plaintiff's moderate limitations in responding appropriately to usual work situations and to changes in a routine work setting.  (AR 35.)

Plaintiff argues that the vague assertion that Plaintiff sought mental health treatment but generally exhibited unremarkable mental status examinations is not a specific and legitimate reasons to reject Dr. Michiel's opinion.  Plaintiff points to the following records that she argues demonstrate abnormal mental health findings.

On July 17, 2015, Plaintiff was seen in the emergency room complaining of chest pain with shortness of breath, sweats, radiation to the left shoulder, and tingling of her left arm.  (AR 1389.)  She was noted to be anxious.  (AR 1391.)  Plaintiff was cooperative with appropriate mood and affect.  (AR 1391.)

On September 22, 2014, Plaintiff was seen in the emergency room complaining of pressure like pain in her mid-chest.  (AR 1100.)  Plaintiff stated that she doubted the symptoms were related to her anxiety because she felt calm.  (AR 1100.)  On examination, Plaintiff was noted to be mildly anxious.  (AR 1101.)  She was alert and oriented to person, place, time and situation.  (AR 1103.)  She was cooperative with appropriate mood and affect and normal judgment.  (AR 1103.)

Plaintiff was seen in the emergency room on September 25, 2014, for chest pain.  (AR 843.)  She was noted to be oriented and alert.  (AR 843.)  On examination, she was noted to be anxious.  (AR 851.)  She was alert and oriented to person, place, time, and situation.  (AR 852.)  Plaintiff was cooperative with appropriate mood and affect and normal judgment.  (AR 852.)

On October 14, 2014, Plaintiff was seen in the emergency room for chest pain that had begun while she was in San Francisco a few days prior.  (AR 814.)  She was noted to be mildly anxious and uncomfortable.  (AR 813.)  She was speaking in full sentences and was alert and oriented times three.  (AR 813.)  On examinations she was noted to be anxious.  (AR 815.)  Plaintiff was alert and oriented to person, place, time and situation.  (AR 815.)  She was cooperative with appropriate mood and affect.  (AR 815.)

On November 11, 2014, Plaintiff was seen in the emergency room with complaints of left shoulder and anterior chest wall pain since the prior day and was noted to be tearful in triage.  (AR 780, 786.)  She reported that the medication was making her sleepy, but was not relieving her shoulder pain.  (AR 788.)  On examination, she was noted to be alert and oriented to person, time, place, and situation.  (AR 789.)  She had normal speech and coordination.  (AR 789.)  Plaintiff was cooperative with appropriate mood and affect and normal judgment.  (AR 789.)

On November 13, 2014, Plaintiff was seen in the emergency room complaining of severe constipation with bloating and abdominal pain.  (AR 720.)  On examination, Plaintiff was noted to be alert and oriented times three.  (AR 720.)  She answered all questions appropriately.  (AR 721.)  Plaintiff was noted to be alert and oriented to person, place, time and situation.  (AR 734.)  She was cooperative with a tearful affect.  (AR 734.)

Plaintiff argues that her December 2014 hospitalization was attributed to a panic attack

with chest pain.  On December 15, 2014, Plaintiff was seen in the emergency room complaining of chest pain.  (AR 645.)  On examination, she was noted to be alert and oriented to person, place, time and situation.  (AR 655.)  She was cooperative with an appropriate mood and affect.  (AR 655.)  She was diagnosed atypical chest pain and anxiety.  (AR 658.)  The discharge diagnosis states atypical chest pain, dilated cardiomyopathy, and panic attack.  (AR 658.)

On December 22, 2014, Plaintiff was seen in the emergency room complaining of shortness of breath with chest pain and pain radiating down her left arm.  (AR 621.)  On examination Plaintiff was alert and oriented to person, place, time and situation.  (AR 622.)  She was noted to be cooperative with an anxious mood and affect.  (AR 622.)

On August 27, 2015, Plaintiff was seen for a refill on her medication.  (AR 1451.)  She reported that she is often jittery and feels like crying for no reason, is easily irritated, and does not like to go out which was getting worse over the previous two weeks.  (AR 1451.)  Plaintiff had stopped taking Zoloft five weeks prior and was taking Xanax which she felt relaxes her.  (AR 1451.)  On examination, Plaintiff was noted to be anxious with increased activity and poor insight and judgment.  (AR 1454.)  She had some psychomotor agitation, moving her hands a lot and getting up and down.  (AR 1454.)  Plaintiff was also noted to be oriented to time, place, person, and situation with no agitation.  (AR 1454.)  She had appropriate mood and affect and was not hopeless.  (AR 1454.)  She was started on Fluoxitine.  (AR 1454.)

Plaintiff was seen in the emergency room on April 10, 2016, complaining that she felt chest tightening and heaviness and when she rolled over her lungs hurt when she was inhaling.  (AR 1769.)  On examination, Plaintiff was noted to be anxious.  (AR 1770.)  She was cooperative with appropriate mood and affect.  (AR 1771.)  On this same date, the chart notes that Plaintiff was cooperative and anxious.  (AR 1821.)

On May 9, 2017, Plaintiff was seen in the emergency room complaining of chest heaviness and numbness and tingling from her left hand up to her arm and face.  (AR 2434.)  On examination, Plaintiff was noted to be anxious.  (AR 2436.)  She was alert and oriented to person, place, time, and situation.  (AR 2436.)  Plaintiff was cooperative with appropriate mood and affect and normal judgment.  (AR 2436.)

Review of the records cited by Plaintiff support the ALJ's finding that, despite being found to be anxious, she generally exhibited unremarkable mental status examinations.  While Plaintiff was noted to be anxious or crying, other than the findings on August 27, 2015, all the records demonstrate normal mental examination findings.

The ALJ also considered the treatment record in addressing Plaintiff's mental impairments finding that "at times, she sought treatment for anxiety, impaired concentration and depressed mood, and exhibited anxious and tearful affect" while "at other times, she denied depression." (AR 33.)  Specifically, the ALJ considered the following.

On September 19, 2014, Plaintiff was seen for a follow up of her depression and had been hospitalized for chest pain and was told she was anemic and had a heart attack.  (AR 339.)  Plaintiff reported anxious/fearful thoughts, depressed mood, difficulty concentrating, difficulty falling and staying asleep, diminished interest or pleasure, fatigue and restlessness.  (AR 339.)  She reported that she was feeling depressed since her heart attack and was having anxiety daily.  (AR 339.)  On examination, Plaintiff was noted to be oriented to time, place, person, and situation with appropriate mood and affect.  (AR 340.)  Insight and judgment were normal.  (AR 340.)

Plaintiff was seen on October 1, 2014, and stated that she had stopped taking her Zoloft after going to the emergency room on September 25, 2014, and had been given Ativan that provided some relief but she felt out of it.  (AR 342.)  On examination, Plaintiff was oriented to time, place, person, and situation with no agitation.  (AR 344.)  She had appropriate mood and affect, no paranoia, and insight and judgment were normal.  (AR 344.)  She was advised to restart her Xanax instead of the Ativan.  (AR 344.)

On October 15, 2014, Plaintiff was seen for a follow-up and reported that she was not taking Zoloft daily and had not started taking the Xanax.  (AR 346.)  On examination, Plaintiff was oriented to time, place, person, and situation with appropriate mood and affect.  (AR 348.)  Insight and judgment were normal.  (AR 348.)  Plaintiff was advised to not take Ativan and Xanax and she was going to take the Ativan until she was out of the medication, and then take the Xanax as needed for anxiety attacks.  (AR 348.)

1    The ALJ also considered the November 13, 2014; and December 22, 2014, emergency
2    room visits discussed above.  (AR 621-622, 733.)

3    On April 2, 2015, Plaintiff was seen for preoperative clearance.  (AR 366.)  She denied
4    psychiatric symptoms.  (AR 367.)

5    On April 6, 2015, Plaintiff was seen for shortness of breath and chest palpitations.  (AR
6    363.)  She denied experiencing any psychiatric symptoms.  (AR 364.)  On examination, Plaintiff
7    was oriented to time, person, and place, with an appropriate mood.  (AR 364.)

8    On April 30, 2015, Plaintiff was seen for chest discomfort.  (AR 360.)  She denied
9    experiencing any psychiatric symptoms.  (AR 361.)  Plaintiff was oriented to time, place and
10   person with appropriate mood.  (AR 361.)

11   On September 10, 2014, Plaintiff went to the emergency room complaining of shortness
12   of breath, blurred vision, nausea, dizziness, and chest and shoulder pain that radiated down her
13   left arm.  (AR 968.)  Plaintiff complained of anxiety.  (AR 968.)  On examination, she was found
14   to be cooperative and alert and oriented.  (AR 969.)

15   The ALJ also found that while there is evidence that Plaintiff sought treatment for anxiety
16   attacks, her mental status examinations generally documented full orientation, appropriate mood,
17   appropriate affect, calm demeanor, cooperative behavior, normal insight and normal judgment.
18   (AR 33.)  Specifically, the ALJ cited to the examination findings addressed above as well as the
19   following.

20   On September 4, 2013, Plaintiff was seen in the emergency room with heavy vaginal
21   bleeding and cramping.  (AR 1076.)  She was noted to be able to participate in two way
22   communication; was calm appropriate, and cooperative; and was able to follow commands.  (AR
23   1074.)  On examination, she was alert and cooperative with appropriate mood and affect.  (AR
24   1077.)

25   On October 16, 2013, Plaintiff was seen in the emergency room complaining of muscle
26   spasms in her back.  (AR 1055.)  Plaintiff was noted to be alert and cooperative with appropriate
27   mood and affect.  (AR 1056.)

28   Plaintiff was seen in the emergency room on November 11, 2014, complaining of left

14

1   shoulder pain.  (AR 393.)  She was noted to be appropriate, calm, and cooperative.  (AR 390.)

2   On examination, Plaintiff was alert and oriented to person, place, time and situation.  (AR 394.)

3   She was cooperative with appropriate mood and affect.  (AR 394.)

4         On November 28, 2014, Plaintiff was seen in the emergency room after having been

5   involved in an automobile accident in which she was driving and was struck by a tow truck from

6   behind.  (AR 693.)  On examination, she was noted to be cooperative and alert and oriented to

7   person, place, time and situation.  (AR 695.)

8         On December 15, 2014, Plaintiff was seen in the emergency room complaining of chest

9   pain.  (AR 654.)  She was noted to be appropriate, calm, and cooperative.  (AR 652.)  On

10  examination, she was noted to be alert and oriented to person, place, time, and situation.  (AR

11  655.)  She was cooperative with appropriate mood and affect.  (AR 655.)

12        On January 29, 2015, Plaintiff was seen in the emergency room with asthma after having

13  run out of her inhaler.  (AR 598.)  Plaintiff was noted to be alert and cooperative.  (AR 599-600.)

14        On February 4, 2015, Plaintiff was seen in the emergency room complaining of pain in

15  her chest and shortness of breath when lying down.  (AR 562.)  On examination, Plaintiff is

16  noted to be alert and oriented to person, place, time and situation.  (AR 563.)  She was

17  cooperative with appropriate mood and affect and normal judgment.  (AR 563.)

18        On February 17, 2015, Plaintiff was seen for a refill on her anxiety and hypertension

19  medication.  (AR 350.)  She reported that she takes about six Xanax pills per week.  (AR 350.)

20  She did not take the Zoloft that had been prescribed for her.  (AR 350.)  On examination,

21  Plaintiff was oriented to time, place, person, and situation with appropriate mood and affect.

22  (AR 352.)  Insight and judgment were normal.  (AR 352.)

23        On March 25, 2015, Plaintiff was seen for chest pain, shortness of breath, and dizziness.

24  (AR 369.)  She denied psychiatric symptoms.  (AR 370.)  On examination she was oriented to

25  person, place, and time with appropriate mood.  (AR 370.)

26        Plaintiff was seen on April 2, 2015, for a follow-up on her congestive heart failure.  (AR

27  366.)  She denied psychiatric symptoms.  (AR 367.)  She was oriented to time, person, and place

28  with appropriate mood.  (AR 367.)

Plaintiff was seen in the emergency room on May 19, 2015, for right knee pain.  (AR 442.)  She was noted to be appropriate, calm, and cooperative.  On examination, she was noted to be alert and cooperative with normal speech.  (AR 445.)

Plaintiff returned to the emergency room on May 21, 2015, complaining of right knee pain that had began two days prior.  (AR 422.)  Plaintiff was noted to be alert and cooperative with appropriate mood and affect.  (AR 423.)

Plaintiff was seen in the emergency room on May 27, 2015, complaining of a "wobbly heartbeat."  (AR 1160.)  On examination, Plaintiff was alert and cooperative.  (AR 1161.)

On June 3, 2015, Plaintiff was seen for a follow-up after she was hospitalized for pacemaker adjustments and for knee pain.  (AR 1446.)  Plaintiff was oriented to time, place, person, and situation with appropriate mood and affect.  (AR 1448.)  Insight and judgment were normal.  (AR 1448.)

The ALJ considered the August 27, 2015; October 1, 2014; October 15, 2014; February 17, 2015 visits that were cited by Plaintiff.  (AR 1433-1435, 1437-1439, 1441-1443, 1451-1454.)

On December 6, 2015, Plaintiff was seen in the emergency room for asthma and back pain after a syncopal episode.  (AR 1299.)  On examination, Plaintiff was alert and oriented, answering questions appropriately.  (AR 1300.)  She was cooperative with appropriate mood and affect and normal judgment.  (AR 1300.)

On January 27, 2016, Plaintiff was seen in the emergency room complaining of chest pain that was radiating to her left arm that she initially had thought were caused by her anxiety.  (AR 1849.)  Plaintiff was noted to be alert and oriented to person, time, place, and situation with normal speech.  (AR 1851.)  She was cooperative with appropriate mood and affect and not suicidal.  (AR 1851.)

The ALJ considered the April 10, 2016 visit discussed above.  (AR 1769-1771.)

On April 14, 2016, Plaintiff was seen in the emergency room for chest pain.  (AR 1590.)  Mental examination notes she was alert and oriented to person, place, time, and situation.  (AR 1592.)  Plaintiff was cooperative with appropriate mood and affect.  (AR 1592.)

Plaintiff was seen in the emergency room on July 9, 2016, after heavy vaginal bleeding.

1   (AR 1508.)  Plaintiff was alert and oriented.  (AR 1510.)  She was noted to be cooperative with

2   appropriate mood and affect.  (AR 1510.)

3   On November 16, 2016, Plaintiff was seen in the emergency room for shortness of breath

4   after walking up some stairs.  (AR 2769.)  Plaintiff was noted to be alert and cooperative with

5   appropriate mood and affect.  (AR 2771.)

6   On October 18, 2017, Plaintiff was seen in the emergency room and was admitted with

7   chest pain.  (AR 1923.)  Psychiatric examination on this date notes oriented times three with

8   appropriate affect and stable.  (AR 1937.)  Plaintiff was taking all her medications except aspirin

9   which she had run out of.  (AR 1928.)  During her stay, psychiatric exam notes appropriate affect

10  and stable.  (AR 1930, 1967, 2041, 2049, 2063.)

11  On February 8, 2018, Plaintiff was seen in the emergency room complaining of right

12  knee pain.  (AR 2220.)  Plaintiff was noted to be cooperative with appropriate mood and affect.

13  (AR 2221.)

14  The ALJ considered the May 9, 2017, emergency room visit addressed above.  (AR

15  2434-2436.)

16  On June 11, 2017, Plaintiff was seen in the emergency room with abdominal pain

17  radiating into her back.  (AR 2309.)  Examination notes Plaintiff is alert and oriented to person,

18  place, time, and situation.  (AR 2311.)  Plaintiff was cooperative with appropriate mood and

19  affect.  (AR 2311.)

20  On September 29, 2017, Plaintiff was seen in the emergency room complaining of severe

21  back pain after she moved furniture the day before.  (AR 2270, 2271.)  Examination notes

22  normal speech, and cooperative with appropriate mood and affect.  (AR 2272.)

23  The ALJ also considered the July 2015 consultative examination by Dr. Lewis.  (AR 33,

24  1277-1282.)  During the examination, Plaintiff exhibited neat grooming, cooperative behavior,

25  pleasant attitude, normal speech, normal thought content, euthymic mood, appropriate affect,

26  intact cognition, appropriate fund of knowledge, normal judgment, normal insight, satisfactory

27  memory, satisfactory concentration, satisfactory attention, and linear, logical, coherent and goal

28  directed thought process.  (AR 33, 1279-1281.)  She performed satisfactorily on a gross indicator

1    of rote learning, memory, attention encoding and auditory processing.  (AR 33, 1280.)  She also

2    reported having several friends with whom she is close to and has known for 30 years.  (AR 33,

3    1281.)

4          As Plaintiff points out the medical record contains thousands of pages of and, while

5    Plaintiff points to several pages showing that she was found to be anxious or tearful and on at

6    least one occasion had abnormal mental status findings, the ALJ pointed to numerous findings

7    through the record that demonstrate Plaintiff generally exhibited unremarkable mental status

8    examinations.    The ALJ could reasonably find that Plaintiff's unremarkable mental status

9    examinations were inconsistent with the moderate limitations opined by Dr. Michiel.

10   Inconsistency with the objective findings in the medical record is a specific and legitimate reason

11   to reject a physician opinion.  See Thomas, 278 F.3d at 957 (9th Cir. 2002); Tommasetti v.

12   Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d

13   595, 600–02 (9th Cir. 1999.  The ALJ provided a specific and legitimate reason to reject the

14   moderate limitations opined by Dr. Michiel that are supported by the medical record.[2]

15        **B.    Whether the Residual Functional Capacity Assessment is Supported by**
           **Substantial Evidence in the Record**
16
17        Plaintiff's second argument asserts that the ALJ failed to develop the record, relied on her

18   own lay opinion of the medical evidence and outdated legal opinions, and failed to consider

19   Plaintiff's subjective complaints.  Here, the gravamen of Plaintiff's argument is that the opinions

20   of the agency physicians are not substantial evidence to support the residual functional capacity

21   assessment that she could perform sedentary work because they did not consider the later

22   medical record.   Specifically, Plaintiff argues the only medical opinions were of the agency

23   physicians and the record demonstrates that Plaintiff's heart condition required additional

24   hospitalization and she subsequently had imaging of her knee disorder that was not addressed by

25   the agency opinions.

26        Defendant counters that the subsequent heart findings that are cited by Plaintiff are

27   _____
     [2] As the Court finds that the ALJ provided a specific and legitimate reason to reject the opinion of Dr. Michiel, it
28   declines to address the other arguments raised by the parties.

1  similar to the findings that were considered by the agency physicians and Plaintiff is merely

2  raising a disagreement with the doctors' assessments and the ALJ findings that is not a basis for

3  reversal.  Additionally, Defendant contends that Drs. Harris and Bobba did consider Plaintiff's

4  knee impairment and its effect on her ability to work.

5      Plaintiff counters that Defendant and the ALJ's speculation that the findings were similar

6  is not sufficient to support the residual functional capacity findings.

7      A claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20

8  C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20

9  C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, §

10  416.920(b) and (c), as well as the total limiting effects caused by medically determinable

11  impairments and the claimant's subjective experiences of pain, § 416.920(e)."  Garrison, 759

12  F.3d at 1011.  At step four the RFC is used to determine if a claimant can do past relevant work

13  and at step five to determine if a claimant can adjust to other work.  Id.  "In order for the

14  testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the

15  claimant's functional limitations, both physical and mental' supported by the record."  Thomas,

16  278 F.3d at 956.

17      In developing Plaintiff's residual functional capacity, the ALJ gave great weight to the

18  opinions of Drs. Bobba and Harris exertional and postural abilities findings.  (AR 34.)  The

19  opinions of non-treating or non-examining physicians are substantial evidence where they

20  opinions are consistent with independent clinical findings or the other evidence in the record.

21  Thomas, 278 F.3d at 957.

22      On August 14, 2015, Dr. Bobba completed a residual functional capacity assessment and

23  determined that Plaintiff could lift and carry 10 pounds occasionally and frequently; stand and/or

24  walk 2 hours in an 8 hour day; sit 6 hours in 8 hour workday; push/pull was unlimited; and

25  Plaintiff could occasionally climb ramps/stairs, ladders/ropes/scaffolds, balance, stoop, kneel,

26  crouch, and crawl.  (AR 86.)  She must avoid concentrated exposure to hazards due to morbid

27  obesity and cardiomyopathy.  (AR 87.)

28      Dr. Harris reviewed the record on reconsideration and affirmed the residual functional

19

1  capacity assessment on January 12, 2016.  (AR 101-102.)

2  **a.      Right knee pain**

3  Plaintiff argues that the agency physicians did not consider her knee impairment in

4  reviewing the record.  However, on reconsideration, Dr. Harris did consider that on August 27,

5  2015, Plaintiff had a torn meniscus with a normal gait and did not exercise but goes for walks

6  and was taking Norco and Tylenol.  (AR 98.)  Dr. Harris affirmed the residual functional

7  capacity.  (AR 102-103.)

8  The ALJ considered that Plaintiff had received treatment for right knee pain.  (AR 32.)

9  On March 21, 2015, Plaintiff was seen in the emergency room for on-going knee pain.  (AR

10  414.)  Plaintiff had been seen on March 20, 2015 and was told that she had a problem with the

11  meniscus.  (AR 420.)  Plaintiff had been seen in the emergency room two days prior at the onset

12  of the knee pain when walking up her porch.  (AR 422, 425.)  On examination, her right knee

13  showed normal range of motion testing, right popliteal fossa tenderness, patellar tenderness on

14  palpation, positive Lachman's test on the lateral side, negative anterior/posterior test, and intact

15  sensation.  (AR 32, 423, 445.)  She was diagnosed with internal knee injury, and prescribed

16  narcotic pain relievers and anti-inflammatory medication.  (AR 32, 446.)  A May 19, 2015 x-ray

17  of Plaintiff's right knee was normal.  (AR 32, 460.)  A May 20, 2015 ultra sound of the right

18  knee was also normal and showed no evidence of deep venous thrombosis.  (AR 32, 461.)

19  Plaintiff had a follow-up for her right knee pain on June 3, 2015.  (AR 32, 1271.)

20  Examination showed tenderness to palpation on the medial aspect of the right knee with no

21  evidence of edema.  (AR 32, 1273.)  She was conservatively treated with Tylenol.  (AR 32,

22  1274.)  Plaintiff was seen in the emergency room on April 14, 2016, and denied knee pain, which

23  the ALJ found indicated that her right knee symptoms had resolved.  (AR 32, 1581.)

24  In February 2018, Plaintiff again sought emergency care for right knee pain that had first

25  manifested five days prior and she only remembered stepping off the curb in a strange way a few

26  days prior to the knee pain starting.  (AR 32, 2213, 2220.)  Examination of the right knee showed

27  tenderness medially and superiorly with limited range of motion and mild joint effusion.  (AR

28  32, 2200, 2221.)  An x-ray of her right knee showed early degenerative changes.  (AR 32, 2222,

1  2225.)  She was diagnosed with arthritis of the right knee, and prescribed narcotic pain relievers

2  and anti-inflammatory medication.  (AR 32, 2222-2226.)

3         The ALJ found that this was the extent of Plaintiff's treatment for right knee pain and that

4  she generally walked with a normal and unassisted gait pattern.  (AR 33.)  Specifically the ALJ

5  noted that on September 3, 2013; September 12, 2014; October 14, 2014; November 11, 2014;

6  November 28, 2014; January 29, 2015; March 25, 2015; April 2, 2015; April 6, 2015; April 30,

7  2015; August 27, 2015; January 27, 2016; April 10, 2016; April 14, 2016; July 9, 2016;

8  November 16, 2016; May 9, 2017; and September 1, 2017; Plaintiff was noted to have a normal

9  gait.  (AR 361, 364, 367, 370, 597, 598, 690, 785, 811, 964, 1074, 1454, 1465, 1548, 1715, 1821,

10 1891, 2413, 2583, 2734; 2924.)  Based on the mild imaging studies, conservative and infrequent

11 treatment for knee pain; and her generally unremarkable gait, the ALJ found that Plaintiff's knee

12 impairment did not preclude work at the sedentary exertional level.  (AR 32.)

13        Plaintiff argues that the ALJ could not make such findings and a medical opinion was

14 necessary to review the laboratory results and objective findings, but review of the February

15 2018 record shows that Plaintiff was informed that her x-ray was negative and that her symptoms

16 were most likely due to inflammation from arthritis.  (AR 2222.)  The ALJ could reasonably find

17 that due to Plaintiff's lack of treatment for knee pain and the normal gait findings in the record,

18 Plaintiff's right knee impairment did not preclude sedentary work.

19              2.    Congestive heart failure

20        Plaintiff also argues that the ALJ's finding that her chronic heart failure does not preclude

21 sedentary work activity is not supported by substantial evidence in the record.  Defendant

22 counters that the ALJ properly considered the evidence after the opinions of Drs. Bobba and

23 Harris and properly determined that Plaintiff retained the ability to perform sedentary work

24 activity and that the opinion was well grounded in the medical evidence.  Plaintiff replies that the

25 ALJ improperly considered medical evidence and relied on her own interpretation in finding that

26 Plaintiff retained the ability to perform sedentary work.

27        The ALJ considered the history of and treatment that Plaintiff had received for her

28 congestive heart failure.  (AR 30-32.)  The ALJ found that Plaintiff has a long history of

1   congestive heart failure and cardiomyopathy with implantable cardiac defibrillator and has

2   responded positively to treatment.  (AR 30.)

3        Specifically, the ALJ considered that on September 10, 2014, Plaintiff was hospitalized

4   after suffering a mild myocardial infarction.  (AR 30, 930.)  A chest x-ray showed mild

5   cardiomegaly and new left bundle branch blockage.  (AR 30, 930.)  An echocardiogram showed

6   left ventricular ejection fraction of 20%.  (AR 30, 390.)  Plaintiff was seen for a follow up and

7   was diagnosed with coronary artery disease, congestive heart failure and hypertension, and

8   started on cardiac medications, including diuretics, beta-adrenergic blocking agents and

9   angiotensin-converting-enzyme inhibitors.  (AR 30, 339, 390.)  Her symptoms improved and she

10  was discharged after two days to follow up with her cardiologist for follow up care.[3]  (AR 30-31,

11  931.)

12       Plaintiff was seen in the emergency room on November 13, 2014, for severe constipation

13  and cardiovascular examination was normal.  (AR 31, 720-721.)  On November 28, 2014,

14  Plaintiff was seen following an automobile accident and cardiovascular examination was normal.

15  (AR 31, 693-694.)  A chest x-ray showed mild cardiomegaly with no acute abnormality.  (AR

16  31, 706.)

17       On October 14, 2014, Plaintiff was seen complaining of chest pain.  (AR 31, 814.)

18  Plaintiff's chest pain was deemed atypical.  (AR 31, 818.)

19       On December 22, 2014, Plaintiff was seen for chest pain and had a chest x-ray that

20  showed no active cardiopulmonary disease and normal cardiac size which the ALJ found

21  supports a positive response to medication management.  (AR 31, 623, 627.)  Again, her chest

22  pain was deemed atypical.  (AR 31, 623.)

23       On January 29, 2015, Plaintiff went to the emergency room for chest pain and

24

---

25  [3] The ALJ found that Plaintiff had a subsequent angiography which revealed normal coronary arteries with
    improved left ventricular ejection fraction of 30%.  (AR 31.)  However, the record notes that she had an angiography
26  in September 2014 that revealed normal coronary arteries with ejection fraction at 30%, but on the recent echo
    ejection fraction was 20% and "there is marked LV enlargement and moderate MR."  (AR 367.)  This medical
27  record was considered by the agency physicians in developing her residual functional assessment and he found that
    Plaintiff had subsequently improved after a pacemaker adjustment.  (AR 81, 83.)  Further, the ALJ also considered
28  this record as discussed below.

1   cardiovascular examination was normal.  (AR 31, 600.)  A chest x-ray showed a mildly enlarged

2   cardiac silhouette, but stable.  (AR 613.)  Impression was no acute cardiopulmonary disease.

3   (AR 613.)

4        On February 4, 2015, Plaintiff sought treatment for shortness of breath and fatigue.  (AR

5   31, 566.)  A chest x-ray showed only mild cardiomegaly with no evidence of acute pulmonary

6   edema.  (AR 31, 564.)  Based on the mild findings, Plaintiff's diuretic medications were

7   increased slightly.  (AR 31, 564.)

8        However, the ALJ also considered that in March 2015, Plaintiff's symptoms worsened.

9   (AR 31.)  Specifically, Plaintiff was seen on April 2, 2015, to get cardiac clearance for a

10  hysterectomy.   (AR 31, 366-368.)   An echocardiogram showed marked left ventricular

11  enlargement and moderate mitral regurgitation with ejection fraction of 15-20%.  (AR 31, 366-

12  367, 372.)  Surgery was to be deferred until after she received an implant and Plaintiff was

13  referred for a consultation regarding an automatic implantable cardioverter defibrillator

14  ("AICD").   (AR 367-368.)   On April 20, 2015, Plaintiff was diagnosed with severe

15  cardiomyopathy, class 2-3 congestive heart failure and left bundle branch block, and referred for

16  surgical intervention.  (AR 31, 490.)  On April 22, 2015, she underwent surgical placement of an

17  AICD.  (AR 31, 492-493.)  By April 30, 2015, Plaintiff's left ventricular ejection fraction had

18  improved to 35% and it was noted that her chest pain was atypical for angina.  (AR 31, 362.)

19  Her hypertension was adequately controlled.  (AR 31, 362.)  Clinical examination showed well-

20  healed incision site.  (AR 31, 362.)  Based on this positive response to treatment, she was

21  continued on her medical therapy and was cleared for surgery.  (AR 31, 362.)  The ALJ also

22  found it notable that on April 2, 2015, Dr. Borno noted that Plaintiff's allegations of chest

23  discomfort were not suggestive of ischemia.  (AR 31, 366.)

24       On May 26, 2015, Plaintiff was hospitalized for two days secondary to chest pain with

25  palpitations and twitching in her left arm.  (AR 31, 1145-1147, 1264-1265.)  These symptoms

26  were attributed to pacemaker dysfunction and the pacemaker was adjusted which resolved her

27  symptoms.  (AR 31, 1147, 1264-1264.)  Plaintiff was ambulatory, was noted to be feeling better,

28  and exhibited intact neurological functioning.  (AR 31, 1264-65.)  The ALJ found that this acute

1    exacerbation was not chronic or prolonged.  (AR 31.)  Upon follow up treatment, Plaintiff's

2    cardiovascular examinations were generally unremarkable, which the ALJ found bolsters the

3    finding that she responded well to treatment citing to a visit on June 3, 2015, in which physical

4    examination was unremarkable, other than finding a scar from the pacemaker and some

5    tenderness to palpation on the medial aspect of the knee.  (AR 31, 1273.)

6        On January 27, 2016, Plaintiff was seen in the emergency room for chest pain that was

7    radiating to her left arm and numbness and tingling of her fingers and physical examination was

8    unremarkable.  (AR 1849.)  As Plaintiff notes, differential diagnosis was ""MI, CHF, ACS,

9    electrolyte abn, and musculoskeletal pain."  (AR 1851.)  She was stable on medication.  (AR 31,

10   1852 .)  Plaintiff's chest x-ray showed persistent unchanged cardiomegaly with no significant

11   interval change.  (AR 31, 1856, 1876.)  Plaintiff was stable upon release and was to follow up

12   with her primary care provider within a week.  (AR 1852.)

13       Plaintiff presented to the emergency room on April 14, 2016, complaining of chest pain

14   that radiated to her back and shortness of breath.  (AR 1581.)  Physical examination was normal.

15   (AR 1582.)  Plaintiff's condition was stable and she was noted to be hemodynamically stable.

16   (AR 1582.)  The electrocardiogram did not show any acute change and a chest x-ray was

17   unremarkable.  (AR 31, 1582, 1661.)  Plaintiff was discharged to follow-up with her primary

18   care physician or cardiologist.  (AR 1582.)  As such, she was continued on her same cardiac

19   medications.  (AR 1902, 1903, 1904, 1905, 1907).  Plaintiff had unremarkable examinations on

20   April 25, 2016; August 23, 2016; February 1, 2017; and August 21, 2017.  (AR 1902, 1903,

21   1904, 1905, 1907.)

22       Plaintiff established treatment with Dr. Chann, a cardiologist, on August 3, 2016.  (AR

23   31, 2203.)  Plaintiff complained of shortness of breath with exertion, but no chest pain.  (AR 31,

24   2203.)  Physical examination was unremarkable, and Plaintiff's medication was increased.  (AR

25   2204.)

26       On January 30, 2017, Plaintiff complained of multiple symptoms with rapid heartbeat,

27   easily short of breath, and getting fatigued.  (AR 2184.)  When compared with her previous

28   symptoms these were found not to be new.  (AR 2184.)  Plaintiff denied any recent episodes of

1  chest pain or palpations.  (AR 31, 2185.)  Physical examination was unremarkable.  (AR 31,

2  2185-2186.)

3      Plaintiff was seen on August 28, 2017, and reported feeling tired, short of breath and

4  fatigued and physical examination was unremarkable.  (AR 31, 2153.)  Diagnostic studies

5  showed no activation of her AICD and she otherwise denied chest pain or palpitations.  (AR 31,

6  2165, 2167.)  Moreover, the parameters of her AICD were within acceptable limits.  (AR 31,

7  2167.)  Her cardiac medications were refilled.  (AR 2165.)

8      On October 18, 2017, Plaintiff sought emergency care for chest pain.  (AR 32, 1921.)  An

9  electrocardiograph showed no evidence of ischemic changes.  (AR 32, 1923.)  Her symptoms

10  improved with nitroglycerin.  (AR 32, 1923.)  Plaintiff's left ventricular fraction was severely

11  diminished at 19%.  (AR 1928.)  She was taking her cardiac medications regularly except she

12  had run out of her aspirin.  (AR 1928.)  Plaintiff's physician was contacted and said there were

13  no electrocardiogram changes compared to the electrocardiogram at the cardiologist's office.

14  (AR 1928.)  Plaintiff was admitted for atypical chest pain which was not likely acute coronary

15  syndrome and was most likely musculoskeletal in origin.  (AR 1928.)  The ALJ found that while

16  there is evidence of reduced left ventricular ejection fraction, a stress was negative for ischemia

17  and her pain was mostly like musculoskeletal in origin.  (AR 32, 1928, 1977-1978.)  She was

18  continued on her cardiac medications, and restarted on daily aspirin.  (AR 32, 1928, 1977.)

19      Upon follow up treatment on November 6, 2017, her pacemaker parameters were within

20  acceptable limitations.   (AR 32, 2156-2157.)   She had well documented episodes of

21  supraventricular tachycardia and activation of the AICD because of ventricular tachycardia

22  which occurred on September 29.  (AR 2157.)

23      Plaintiff argues at the time the agency physicians reviewed the record they found only

24  two emergency room visits for her chest pain, and that she continued to require emergency

25  treatment and hospitalizations for her chronic heart failure, chest pain, and acute exacerbations of

26  heart failure.  Plaintiff argues the following subsequent records were not considered by the

27  agency physicians and remand is required for further review of the record.

28      The January 27, 2016; April 14, 2016; October 18, 2017 emergency room visits; the

25

1    August 3, 2016, visit to establish treatment with Dr. Chann; and visits on January 30, 2017; and

2    November 6, 2017 as discussed above.

3          Further, Plaintiff argues that the following records were not considered by the ALJ.

4    Plaintiff presented to the emergency room on April 10, 2016 complaining of shortness of breath

5    and back pain.  (AR 1769.)  Physical examination was unremarkable.  (AR 1771.)  A chest x-ray

6    was taken that showed no evidence of pulmonary embolus and a small right pleural effusion.

7    (AR 1801.)  The attending physician found it suggested the possibility of a mild asymmetric

8    pulmonary edema or pneumonia.  (AR 1772.)  Plaintiff was treated for pneumonia.  (AR 1772.)

9          Plaintiff was seen for a pacemaker check on September 12, 2016.  (AR 2200.)  Her

10   pacemaker parameters were within acceptable limits.  (AR 2201.)  Cardiac synchronization

11   therapy showed numerous episodes of supraventricular tachycardia and her beta blocker dosage

12   was adjusted.  (AR 2201.)

13         Plaintiff was seen for a follow up on September 26, 2016, and denied any chest pain,

14   palpitations or new cardiac complaints.  (AR 2197.)  Physical examination was unremarkable.

15   (AR 2198.)  Plaintiff's medication was increased.  (AR 2199.)

16         On October 7, 2016, Plaintiff was seen for a follow-up and reported no recent episodes of

17   chest pain or palpitations.  (AR 2194.)  Physical examination was unremarkable.  (AR 2194.)

18   Her medication was adjusted.  (AR 2195.)

19         Plaintiff went to the emergency room on November 16, 2016, complaining of shortness

20   of breath when walking up the stairs.  (AR 2754.)  An EKG showed a left bundle branch block

21   which was consistent with previous EKGs.  (AR 2754.)  She had ejection fraction of 20%.  (AR

22   2736.)  A chest x-ray showed cardiomegaly with mild vascular congestion.  (AR 2754.)  She was

23   admitted for acute heart failure.  (AR 2754.)  She was to double her Lasix over the next two days

24   and follow-up with her health care providers.  (AR 2756.)

25         Plaintiff returned to the cardiologist on November 28, 2016, and reported that she had

26   went into heart failure after developing an upper respiratory infection.  (AR 2190.)  She denied

27   any new symptoms.  (AR 2190.)  Physical examination was unremarkable.  (AR 2191.)  She was

28   noted to have significant resting tachycardia and her medication was adjusted.  (AR 2192.)

Plaintiff returned on December 5, 2016, for a pacemaker check and AICD parameters were within acceptable limits and there was no activation of her AICD.  (AR 2188.)

On February 16, 2017, Plaintiff had a holter monitor which recorded no ventricular tachycardia or symptoms.  (AR 2181.)  On February 21, 2017, the findings note: "1) Dilated LVe with severely reduced EF 15-20%; 2) Moderately dilated LA size without any obvious mass or thrombus; 3) Mod-severe mitral regurgitation; 4) mod-severe tricuspid regurgitation, estimated RVSP 44 mm Hg; 5) No pericardial effusion.  (AR 2178.)  These findings are consistent with dilated cardiomyopathy."  (AR 2178.)

Plaintiff was seen for a follow-up on March 3, 2017.  (AR 2174.)  Plaintiff denied any recent chest pain, palpitations or cardiac complaints.  (AR 2174.)  Physical examination was unremarkable.  (AR 2175.)

On March 6, 2017, Plaintiff had a pacemaker check that showed the parameters were within normal limits.  (AR 2173.)  The atrial lead was not capturing appropriately, but Plaintiff had normal sinus rhythms.  (AR 2173.)  It was recommended that changes be made to the AICD. (AR 2173.)

On May 9, 2017, Plaintiff was seen in the emergency room complaining of left arm numbness and weakness and tingling and numbness and tingling of the left face.  (AR 2434, 2580.)  During physical therapy on May 10, 2017, she became lightheaded about halfway through gait training.  (AR 2434.)

Plaintiff returned on June 26, 2017, and denied any recent chest pains, palpations, or new cardiac complaints.  (AR 2169.)  Physical examination was unremarkable.  (AR 2170.)

On August 7, 2017, Plaintiff had a pacemaker check that showed the AICD parameters were within acceptable limits.  (AR 2167.)  She had several short episodes of supraventricular tachycardia.  (AR 2167.)  There had been no activation of the AICD and no shocks were delivered.  (AR 2167.)  Plaintiff was seen on August 28, 2017, and reported very atypical needle like discomfort in the left breast area.  (AR 2162.)  Physical examination was unremarkable. (AR 2163.)  She denied having any palpations.  (AR 2164.)

On September 26, 2017, Plaintiff had an echocardiogram which showed: "1) Dilated LV

1  cavity sev. decreased LV syt. Function, EF 20-25%; 2) Thickened MV severe MR mod dilated

2  LA size without any obvious mass or thrombus; 3) Normal RV size, normal contractility; 4) Mild

3  PL, mod-TR, RVS - 43 mm hg; mod-TR. RVSP; 5) No pericardial effusion." (AR 2159.)

4         While the ALJ considered the physician and emergency room visits showing generally

5  unremarkable physical examinations and the results showing that Plaintiff's pacemaker was

6  functioning properly with no activation of her AICD, there are also test results in the subsequent

7  record showing that Plaintiff's left ventricular ejection fraction has severely diminished, that she

8  has had episodes of supraventricular tachycardia, and was admitted to the hospital for acute heart

9  failure.  While the ALJ found that the October 18, 2017 stress test was negative for ischemia and

10 that Plaintiff's pain was most likely musculoskeletal in nature (AR 32, 1928), the agency

11 physicians did consider that Plaintiff's left ventricular ejection fraction was 15 to 20% prior to

12 her AICD surgery, but had improved to 35% following surgery.  (AR 366-367, 362.)  Yet

13 subsequently, Plaintiff's echocardiograms showed that her left ventricular ejection fraction was

14 severely diminished at 19% and Dr. Borno indicated that this was consistent with the findings in

15 his office.  (AR 1928.)  Additionally, pacemaker testing showed that Plaintiff was having

16 episodes of supraventricular tachycardia (AR 2167), and Dr. Borno noted moderate to severe

17 mitral and tricuspid regurgitation (AR 2178).  This evidence is not susceptible to lay

18 interpretation and no medical opinion has been offered on how these findings effect Plaintiff's

19 ability to perform work activity.

20        The Court finds that substantial evidence does not support the residual functional

21 capacity finding and this action shall be remanded for further proceedings.  On remand, the ALJ

22 shall obtain additional medical opinion evidence as to Plaintiff's physical functioning from a

23 consultative examiner or a medical expert, and further develop the record as necessary.

24        **C.     Symptom Testimony**

25        Plaintiff argues that the ALJ erred in discounting her subjective symptom testimony.

26 Since this matter is being remanded for further evaluation of the medical evidence which may

27 affect the credibility determination, the Court declines to further address the credibility finding.

28 However, the Social Security regulations require the Commissioner to set forth a discussion of

the evidence, and the reason or reasons upon which the decision is based.   42 U.S.C. § 405(b)(1)).   The ALJ is advised that the agency must explain its reasoning in order for the Court to be able to perform a meaningful review.   To meet the burden, the ALJ must "specifically identify the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony."   Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001)). Accordingly, "[g]eneral findings are insufficient" for an ALJ to meet the burden of setting forth clear and convincing reasons to reject a claimant's testimony.   Treichler, 775 F.3d at 1102.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the physical residual capacity assessment is not supported by substantial evidence in the record.   Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order.   It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Aurora Lopez and against Defendant Commissioner of Social Security.   The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   __**November 12, 2020**__                    _____
                                                                          UNITED STATES MAGISTRATE JUDGE